IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


TOP SURE INVESTMENTS, INC.,

             Plaintiff,            CA No.
                                     1:15-cv-00048-ABJ-AK
      vs.                     Washington, DC
                                     August 12, 2015
MARCK PROPERTIES GROUP, LLP,     3:40 p.m.
et al.,

             Defendants.
_____/


TRANSCRIPT OF MOTIONS HEARING
BEFORE THE HONORABLE ALAN KAY
UNITED STATES DISTRICT MAGISTRATE JUDGE


APPEARANCES:


For the Plaintiff:       MICHAEL A. COOGEN, JR., ESQ.
                         Coogen Law, PLLC
                         5015 6th St N
                         Arlington, VA 22203


Recorded By:            FTR Gold Recording Software


Transcribed By:         JEFF M. HOOK, CSR, RPR
                         Official Court Reporter
                         U.S. Courthouse, Room 4700-C
                         333 Constitution Avenue, NW
                         Washington, DC  20001


Proceedings recorded by digital audio equipment; transcript
produced by computer-aided transcription

1                        C O N T E N T S

2    <u>WITNESS</u>                                    <u>DIRECT</u>

3    BRYAN TOPSCHER

4    By Mr. Coogen                                     8

5

6

7                        E X H I B I T S

8          <u>NUMBER</u>                                <u>ADMITTED</u>

9    PLAINTIFF'S EXHIBIT:

10         No. 1                                       12

11         No. 2                                       14

12         No. 3                                       16

13         No. 4                                       17

14         No. 5                                       20

15         No. 6                                       20

16         No. 7                                       22

17         No. 8                                       27

18

19

20

21

22

23

24

25

1                          P R O C E E D I N G S

2              COURTROOM DEPUTY:  Civil action 2015-48, Top Sure

3      Investments, Inc. versus Marck Properties Group, LLP, Robert

4      A. Moore, LLC and William L. Jones, LLC.  Michael Coogen,

5      Junior representing the Plaintiff.  This case is set for a

6      motion hearing; Plaintiff's renewed motion for default

7      judgment.

8              THE COURT:  Mr. Coogen.

9              MR. COOGEN:  Good afternoon, your Honor.

10             THE COURT:  Good afternoon.  So you're ready to go

11     forward with the damages as a result of the default?

12             MR. COOGEN:  Yes, your Honor.

13             THE COURT:  How many do we have?  How many people do

14     we have on the default?

15             MR. COOGEN:  Well, one witness, your Honor.

16             THE COURT:  Pardon?

17             MR. COOGEN:  I have one witness.

18             THE COURT:  No, I understand that.  But in terms of

19     the defaulting Defendants --

20             MR. COOGEN:  There's Robert Moore, LLC, William Jones,

21     LLC and Marck Properties, LLC.

22             THE COURT:  That's it?

23             MR. COOGEN:  That's it, your Honor.

24             THE COURT:  Alright.  Choice of law, before we get

25     into the damages aspect, Maryland or D.C.?

1          MR. COOGEN:  Your Honor, we're using D.C. as the

2    default.

3          THE COURT:  Why is that?

4          MR. COOGEN:  Well, actually -- you know, actually in

5    order to stick to the contracts, we'll agree to use Maryland

6    law, your Honor.

7          THE COURT:  Well, wait a minute, either it's going to

8    be Maryland law --

9          MR. COOGEN:  It's going to be Maryland law, we'll

10   stick with the...

11         COURTROOM DEPUTY:  I'm sorry, I'm not --

12         THE COURT:  Yes, would you come up to the podium,

13   Mr. Coogen.

14         MR. COOGEN:  Your Honor, D.C. and Maryland are very

15   much close, so there's no nuance or I don't think anything

16   that's going to be different.

17         THE COURT:  But there is a differential, is there not,

18   with respect to the unjust enrichment and conversion?

19         MR. COOGEN:  Well, your Honor, in all honesty, for the

20   conversion count I don't believe that there was malice.

21         THE COURT:  But I think there's a difference in the

22   Maryland law as D.C. law with respect to those.

23         MR. COOGEN:  But what I would do, your Honor, for the

24   breach of contract -- in other words, the unjust enrichment

25   and the conversion, I believe those were more extraneous

1    counts.  Because honestly, your Honor, looking at everything I

2    don't -- there was no malice or intent not to do anything on

3    behalf of -- on behalf of Marck Properties, LLP.

4              THE COURT:  Okay, so --

5              MR. COOGEN:  So with those counts, your Honor, I would

6    think my client would be interested in -- I mean, with the

7    breach of the note and the contract, the joint venture.

8              THE COURT:  Well, can we do this briefly, Mr. Coogen?

9    Do you have a copy of your complaint?

10             MR. COOGEN:  Yes, I do, your Honor.

11             THE COURT:  Alright.  So that we can understand which

12   counts that there's going to be here this afternoon.  So you

13   brought count -- page nine.

14             MR. COOGEN:  Your Honor, count one for the breach of

15   contract.

16             THE COURT:  Right.

17             MR. COOGEN:  The unjust enrichment is a count that

18   it's quasi contract in nature.  That's if there was an issue

19   regarding that the contract wasn't valid for whatever reason

20   or if that was being contested.  So count two, your Honor,

21   that would be restitution in essence under the unjust

22   enrichment.  But my client -- and the conversion count, your

23   Honor, count three --

24             THE COURT:  Wait a second, you're standing with count

25   two, unjust enrichment?

1          MR. COOGEN:  No, your Honor, count two is -- it's --

2     we're not standing with that.

3          THE COURT:  You're not standing with that, okay.

4          MR. COOGEN:  Correct, your Honor.

5          THE COURT:  Good.  Three, conversion?

6          MR. COOGEN:  Your Honor, I've not seen evidence that

7     showed that there was malice.

8          THE COURT:  Very well.  That narrows things down, yes.

9     And then you have count four, breach of fiduciary and

10     negligence.

11          MR. COOGEN:  That count --

12          THE COURT:  That stands?

13          MR. COOGEN:  That stands, yes, your Honor.

14          THE COURT:  Good.

15          MR. COOGEN:  And then the other counts are referring

16     to Clearview which are in the case, and I'm not going to --

17     you know, that those issues are disputed and I'm not going

18     to --

19          THE COURT:  So as I say, before you're going to put

20     your witness on the stand, so let's go and see -- let's see.

21     Alright.  With respect to the liability, Mr. Coogen, from the

22     complaint, the breach of contract, yes?

23          MR. COOGEN:  Correct, your Honor.

24          THE COURT:  Alright.  Unjust enrichment is out,

25     conversion is out and negligence stands.  So it's going to be

1   from those four two of them.  With respect on the damages,

2   perhaps you could explain -- unless your witness may want to

3   do this, a constructive trust.

4           The property that was in D.C. has been sold, has it

5   not?

6           MR. COOGEN:  That's correct, your Honor.

7           THE COURT:  So what's the nature of a constructive

8   trust?  I mean, if you could give me a definition of that with

9   respect to that particular house.

10          MR. COOGEN:  But the claim -- it would be breach of

11  the contract, your Honor.  And the negligence for the way the

12  sale -- why would there be a constructive trust regarding the

13  sale?

14          THE COURT:  I don't know.  I think -- you have -- it's

15  not my constructive trust, I think it's something that's in --

16          MR. COOGEN:  But your Honor, there is no -- in other

17  words, it's a breach of the contract of --

18          THE COURT:  What does Plaintiff mean, "Constructive

19  trust be imposed or proceeds of any sale of the property"?

20          MR. COOGEN:  What happened was, your Honor, when this

21  case started in February there was an issue regarding -- there

22  was an issue regarding foreclosure.  The foreclosure was

23  discovered when we filed the lis pendens.

24          THE COURT:  As of now?

25          MR. COOGEN:  As of now, that there is no constructive

1  trust, your Honor.  And that little remnant --

2          THE COURT:  That's fine.

3          MR. COOGEN:  Okay, just the --

4          THE COURT:  No, no, we were troubled by that, that the

5  house had sold and then you were talking about a constructive

6  trust and it didn't make any sense to us.  Good, alright,

7  you've made things a lot simpler for us.

8          MR. COOGEN:  Correct, your Honor.

9          THE COURT:  Okay, alright.  Damages.

10          MR. COOGEN:  Your Honor, I have Mr. Topscher,

11  president of Top Sure Investments, here to testify regarding

12  the damage issue.  I would like to call him to the stand.

13          THE COURT:  Surely.

14          COURTROOM DEPUTY:  Please raise your right hand.  Do

15  you solemnly swear that the testimony you will give to the

16  Court in the case now on hearing will be the truth, the whole

17  truth and nothing but the truth so help you God?

18          THE WITNESS:  I do.

19          COURTROOM DEPUTY:  Thank you.  You may be seated.

20       DIRECT EXAMINATION BY MR. COOGEN

21  BY MR. COOGEN:

22     Q.  Good afternoon, Mr. Topscher.

23     A.  Good afternoon.

24     Q.  Could you please tell -- state your full name for the

25  record.

1          A.   Bryan Matthew Topscher.

2               COURTROOM DEPUTY:  And spell it for the record.  I

3     have it, but for the record.

4               THE WITNESS:  B-R-Y-A-N, M-A-T-T-H-E-W,

5     T-O-P-S-C-H-E-R.

6     BY MR. COOGEN:

7          Q.   And what is your position with Top Sure Investments?

8          A.   I'm the president of Top Sure Investments.

9          Q.   Okay.  And what type of work is the business Top Sure

10    Investments in?

11         A.   We do real estate investing in commercial and

12    residential.

13         Q.   And where is Top Sure Investments located?

14         A.   Its headquarters is in Virginia.

15         Q.   And is it also based -- is it based anywhere else?

16         A.   There is a -- it's actually formed in Nevada, so it's

17    a Nevada corporation.

18         Q.   And what are your duties and responsibilities with Top

19    Sure Investments?

20         A.   I handle the paperwork and make the -- help make the

21    investment decisions with my partner.

22         Q.   And who is your partner?

23         A.   Jennifer Topscher.

24         Q.   Okay.  And she is an officer of the corporation?

25         A.   She's the vice president.

1    Q.  Okay.  And you're also responsible as the custodian of

2  records for Top Sure Investments?

3    A.  I am.

4    Q.  And you're familiar with the documents and the

5  investment transactions that occur in the business?

6    A.  Yes.

7    Q.  And you're familiar with the documents that were

8  generated regarding this particular property transaction

9  that's the subject of this lawsuit?

10    A.  Yes, I am.

11    Q.  Okay.  And what was -- what is Marck Properties, the

12  limited liability partnership?

13    A.  Marck Properties is a company owned by William Jones,

14  LLC and Bob Moore, LLC.

15    Q.  Okay.  And who are the people that you dealt with out

16  of those companies?

17    A.  William Jones and Bob Moore.

18    Q.  And was there a time and occasion where you dealt with

19  anybody else?

20    A.  Only solely those two people.

21    Q.  Okay.  And was there an occasion when Top Sure

22  Investments entered into a business transaction with Marck

23  Properties, LLP?

24    A.  Yes.

25    Q.  And what was the nature of that transaction?

1        A.   It was an investment in a property at 4922 Seventh

2    Street in Washington, D.C., and we provided funding for it.

3             MR. COOGEN:   Your Honor, at this time I have this

4    marked as Plaintiff's Exhibit 1.   Can I --

5             THE COURT:   Surely you may go, yes.

6    BY MR. COOGEN:

7        Q.   Mr. Topscher, I show you what's been marked as

8    Plaintiff's Exhibit No. 1.   Can you please tell the Court what

9    that document is?

10       A.   A memorandum and joint venture agreement.

11       Q.   And who was that signed with?

12       A.   It was Top Sure Investments and Marck Properties

13   Group, LLC.

14       Q.   And what was the purpose of the joint -- what was the

15   purpose of the joint venture agreement?

16       A.   To lay out how we were going to be purchasing the

17   property and who provided what monies.

18       Q.   And what role was Top Sure Investments as far as that

19   joint venture agreement?

20       A.   We were what we call a gap funder, we provided the

21   funding after the first lienholder.

22       Q.   And how much was the gap funding monies, the amount

23   that Top Sure was required to pay to the deal?

24       A.   For this it was $93,592.12 -- 15 cents.

25       Q.   And was it the regular business activity of Top Sure

1    Investments to use such agreements for their businesses?

2        A.   Yes.

3        Q.   And to supply it to Marck Properties, correct?

4        A.   Yes.

5        Q.   And was Top Sure -- did they expect to get a return

6    with this investment?

7        A.   Yes.

8        Q.   This was not a gift that you were giving Marck

9    Properties?

10       A.   That's correct.

11           MR. COOGEN:  Your Honor, I'd like to move in

12   Plaintiff's Exhibit No. 1 into evidence.

13           THE COURT:  Okay.

14   BY MR. COOGEN:

15       Q.   Now, $93,592.15, that's a lot of money, correct?

16       A.   Yes.

17       Q.   And in order to -- sort of to memorialize the

18   transaction, was there a note that was signed by Marck

19   Properties Limited Liability Partnership?

20       A.   Yes.

21           MR. COOGEN:  Your Honor, I have marked as Plaintiff's

22   Exhibit No. 2, may I approach the witness?

23           THE COURT:  Yes, you may.

24   BY MR. COOGEN:

25       Q.   Mr. Topscher, I show you what's been marked as

1    Plaintiff's Exhibit No. 2.  Can you please tell the Court what

2    that is?

3         A.   A real estate lien note.

4         Q.   And what was the purpose of the note?

5         A.   To -- to have on paper the actual transaction of us

6    lending them money and the rate.

7         Q.   And who was the note signed by?

8         A.   It was signed by Bob Moore, LLC.

9         Q.   Okay.  And that -- and Robert Moore, LLC was a partner

10   of the Marck Properties Limited Liability Partnership?

11        A.   Correct.

12        Q.   And when was this note executed?

13        A.   This was executed August 6th, 2013.

14        Q.   And what was the time period for the note, what were

15   the terms of the note?

16        A.   10 percent interest and due on sale.  A balloon

17   payment due one year or upon sale of the property.

18        Q.   So what the understanding is was that they were to --

19   what was the understanding regarding-- why was it like monthly

20   payments?  What was the purpose of the year note?

21        A.   To give them an opportunity to get the house rehabbed

22   and sold.

23        Q.   And then the balloon payment, the purpose of the

24   balloon payment was to -- what was the purpose of the balloon

25   payment?

1        A.   To make sure that we got our principal and interest at

2   the end of the transaction.

3        Q.   And that was for any unpaid monies, is that correct?

4        A.   Yes.

5        Q.   Okay.  And is it a regular business activity of Top

6   Sure Investments to use promissory notes in such transactions

7   when they consider it a good amount of money, and in this case

8   the $93,592.15?

9        A.   Yes.

10           THE COURT:  Do you have a copy of the note,

11  Mr. Coogen?

12           MR. COOGEN:  Yes, I do.

13           THE COURT:  And the --

14           MR. COOGEN:  And the joint venture agreement.  You

15  already have the joint venture agreement?

16           THE COURT:  No, I don't think so.

17           MR. COOGEN:  Your Honor, at this time I'd like to move

18  Plaintiff's Exhibit No. 2 into evidence.

19           THE COURT:  No. 2 is in the record, yes.

20  BY MR. COOGEN:

21       Q.   In order to secure the promissory note -- because this

22  involved real estate property -- real property, what did you

23  also have Marck Properties, LLP sign?

24       A.   A deed of trust.

25           MR. COOGEN:  Your Honor, at this time I have marked as

1    Plaintiff's Exhibit No. 3 for identification.  May I approach?

2          THE COURT:  You may indeed.

3    BY MR. COOGEN:

4      Q.  I show you what's been marked as Plaintiff's Exhibit

5    No. 3 for identification.  Can you tell me -- tell the Court

6    what that document is?

7      A.  It's a deed of trust between Marck Properties as the

8    grantor and Top Sure Investments as the beneficiary.

9      Q.  And when was that deed of trust signed?

10     A.  August 6th, 2013.

11     Q.  And the amount that was to be secured in the note?

12     A.  $93,592.12.

13     Q.  And it was also a regular business activity that you

14   would use a deed of trust when doing such a property -- in

15   doing a deal with such real property, is that correct?

16     A.  Yes.

17     Q.  But the one problem with the note was that -- was

18   there a problem with the note that you discovered later on

19   throughout this transaction?

20     A.  It was not recorded.

21     Q.  Okay.  And in both the note and deed of trust, there's

22   provisions that provide for attorney's fees, is that correct?

23     A.  Yes.

24          MR. COOGEN:  And your Honor, at this time I'd like to

25   move Plaintiff's Exhibit No. 3 into evidence.

1          THE COURT:  Okay, Exhibit No. 3 is entered into the

2     record.

3     BY MR. COOGEN:

4        Q.  Now, was there an occasion when the monies were to be

5     paid?  The $93,592.13, was that to be -- that was going to be

6     paid -- was there an occasion that Top Sure Investments paid

7     this money?

8        A.  Yes, we wired it on the -- on August 6th.

9        Q.  And how did you know to wire the money?

10       A.  Clearview Title sent us wiring instructions.

11       Q.  And who was Clearview Title?

12       A.  They were the closing company, the title company for

13    the transaction.

14       Q.  And how did you come to discover Clearview Title?

15       A.  Bob Moore as part of the transaction was closing with

16    that company.  I believe that -- or William Jones had a

17    previous history with that company.

18          MR. COOGEN:  Your Honor, at this time I'd like to have

19    marked as Plaintiff's Exhibit No. 4 for identification.  May I

20    approach?

21          THE COURT:  You may indeed.

22    BY MR. COOGEN:

23       Q.  Mr. Topscher, can you tell the Court what that

24    document is?

25       A.  This is a bank statement.

1      Q.   And a bank from who?

2      A.   From USAA Federal Savings Bank.

3      Q.   And who's on the account for that statement?

4      A.   Bryan Topscher or Jennifer Topscher.

5      Q.   Is this an account that Top Sure Investments uses to

6   transact monies for real estate deals?

7      A.   Yes.

8      Q.   And this was the transaction that was used in this

9   particular deal for the D.C. property, is that correct?

10     A.   That is correct.

11     Q.   Okay.  And on this transaction, is there -- is the

12   amount that was wired, the $93,592.13, reflected?

13     A.   15 cents, but yes.

14     Q.   15 cents, okay.  And it's the regular business

15   activity of Top Sure Investments to use those statements in

16   order to keep track of the financing that moves in and out of

17   your company, is that correct?

18     A.   Yes.

19     Q.   And it was used in this particular transaction?

20     A.   Yes.

21         MR. COOGEN:  Your Honor, at this time I'd like to move

22   in as Plaintiff's Exhibit No. 4 for evidence.

23         THE COURT:  Alright, No. 4 for identification will be

24   entered.

25   BY MR. COOGEN:

1      Q.  Now, was there a time when this settlement was

2   happening with Clearview settlement company, was there a time

3   where confirmation was given, where confirmation was exchanged

4   between Clearview and Top Sure Investments?

5      A.  Yes, I did receive confirmation from Clearview.

6          MR. COOGEN:  Your Honor, at this time I'd like to mark

7   what's Plaintiff's Exhibits 5 and 6 for identification.  May I

8   approach, your Honor?

9          THE COURT:  Yes, indeed.

10  BY MR. COOGEN:

11     Q.  Mr. Topscher, I show you what's been marked as

12  Plaintiff's Exhibits 5 and 6 for identification.  Could you

13  please tell me what Exhibit 5 is?

14     A.  Exhibit 5 is an e-mail from me to Holly Edelstein at

15  Clearview Title asking her if she received the -- or telling

16  her that we sent the wire and giving the tracking number.

17     Q.  And who also was the e-mail addressed to?

18     A.  It was also addressed to Marck Properties Group.

19     Q.  Okay.  And what precipitated this response e-mail be

20  sent to Clearview?

21     A.  They sent an e-mail saying that they hadn't seen the

22  funding yet.

23     Q.  And did you receive a reply e-mail back from Clearview

24  Title?

25     A.  Yes.

```
 1        Q.   And what was the response?

 2        A.   "I just received it 10 minutes ago, thank you for

 3   checking."

 4        Q.   Okay.  And who was the e-mail addressed to?

 5        A.   It was just addressed to myself and Marck Properties

 6   Group.

 7        Q.   And bryan@tsinvest.com, that is your regular e-mail

 8   that you use?

 9        A.   Yes, for the company.

10        Q.   For the company.

11             THE COURT:  Mr. Coogen, if I can just interrupt you

12   for a few moments.  We've got Plaintiff's Exhibits, but they

13   don't -- 1 through 6.  And so I'm going to be -- Kim, we

14   should identify these with the exhibit number.  These numbers

15   do not relate to the numbers here, Plaintiff's Exhibits.  So

16   let's see how we go here.  So this -- the bank agreement, this

17   is accurate.  Let's see.

18             MR. COOGEN:  Exhibit 1 is the joint venture agreement.

19             THE COURT:  And the note is 2.

20             MR. COOGEN:  Right.

21             THE COURT:  And 3 is the charts, yes?

22             MR. COOGEN:  Yes.

23             THE COURT:  And 4 is what?

24             MR. COOGEN:  4 is the --

25             THE WITNESS:  The bank statement.
```

1          MR. COOGEN:  -- bank statement, USAA statement.

2          THE COURT:  I don't know.

3          THE WITNESS:  Yes, sir, I believe that's it.

4          MR. COOGEN:  That's marked as Plaintiff's Exhibit 4,

5   your Honor.

6          COURTROOM DEPUTY:  This is the bank statement.

7          THE COURT:  Pardon?

8          COURTROOM DEPUTY:  This is the bank statement.

9          THE COURT:  Alright.  So 5 and 6 has yet to be --

10   okay, good.

11          THE WITNESS:  Yeah, they're right there.

12          THE COURT:  I wasn't sure.  I thought that 4 was 5 or

13   something like that.  Okay.

14   BY MR. COOGEN:

15     Q.  And the e-mails and the communication are maintained

16   as part of the business records for Top Sure Investments?

17     A.  Yes.

18          MR. COOGEN:  Your Honor, at this time I'd like to move

19   Plaintiff's Exhibits 5 and 6 into evidence.

20          THE COURT:  Very well.  5 and 6 marked for

21   identification will be admitted.

22          COURTROOM DEPUTY:  I'm sorry, could I get an

23   identification on No. 6, please?

24          MR. COOGEN:  No. 6 is the response e-mail from

25   Clearview Title.

1      Q.  And after closing, were there additional monies paid

2  to Marck Properties, LLP?

3      A.  Yes.

4      Q.  And what were those additional monies?

5      A.  $15,000.

6      Q.  And what was the $15,000 for?

7      A.  It was the first construction draw.

8      Q.  And who was that paid to?

9      A.  William Jones.

10         MR. COOGEN:  Your Honor, at this time I've marked as

11  Plaintiff's Exhibit No. 7 for identification.

12         THE COURT:  Very well, Exhibit 7 for identification.

13  BY MR. COOGEN:

14     Q.  Mr. Topscher, could you tell the Court what the

15  document shows?

16     A.  It shows a check deposited by William Jones written

17  for August 7th, 2013 for $15,000.

18     Q.  And the check indicates what the first draw for --

19     A.  For Seventh Street, yes.

20         THE COURT:  When you say Jones, is that Jones, LLC or

21  Jones individual?

22         MR. COOGEN:  It was paid to Jones individually, your

23  Honor, but he was acting on behalf of William Jones, LLC.

24  He's the sole member of the limited liability company.

25     Q.  Is that -- am I right, he wasn't accepting this

1    personally?

2         A.   That's correct.

3         Q.   And what was William Jones, LLC?  What was the purpose

4    of the company?  What did they do?

5         A.   They were part of Marck Properties Group.  I don't

6    know that they did anything else other than Marck Properties

7    Group.

8         Q.   I guess for Marck Properties, LLP, what was the role

9    of William Jones, LLC?

10        A.   He was the construction lead for their company.

11        Q.   And when he was doing -- when he -- so in this

12   particular house to do the rehabilitation, he was the one that

13   was to do the rehabilitation?

14        A.   That's correct.

15        Q.   And this -- and the check that was written to him was

16   written by?

17        A.   It was written by myself.

18        Q.   On behalf of?

19        A.   On behalf of Top Sure Investments.

20             MR. COOGEN:  Your Honor, at this time I'd like to move

21   in Plaintiff's Exhibit No. 7.

22             THE COURT:  Exhibit 7 for identification will be

23   entered.  With respect to the note, Mr. Coogen, I see it's

24   signed by Mr. Moore, LLC and the maker of the note is the --

25   is it Marck?

1           MR. COOGEN:  It's Marck Properties, LLP.

2           THE COURT:  Marck Properties, LLP?

3           MR. COOGEN:  That's correct, your Honor.

4           THE COURT:  I see.  And Mr. Moore was what in Marck

5  Properties, what status is he?

6           MR. COOGEN:  He's -- basically the way they have it

7  structured is you have Marck Properties, LLP.  You have the

8  two limited liability companies.  They are the sole members of

9  the limited liability company.  So they've partnered up under

10 Marck Properties, LLP, but one does the real estate deals, the

11 marketing, the selling, and William Jones, LLC did the

12 construction and rehab.  So they merged together to form the

13 entity limited liability partnerships.

14          But your Honor, in essence they're a partnership.  So

15 they will partake of the fruit of their partnership and they

16 will partake of the liabilities of that.  Under them, they are

17 sole member limited liability -- members of that, so there's

18 no other employee or individual that Mr. Topscher was working

19 with.  So he was very close together working with him.

20 Mr. Jones would fix it and Mr. Moore would market it.  That's

21 the structure to keep it all straight in your head, your

22 Honor.

23          THE COURT:  Okay, thank you.

24 BY MR. COOGEN:

25     Q.  And the monies that you -- the monies that you had

1   paid out, you were expecting a return back on the property, is

2   that correct?

3       A.   That's correct.

4       Q.   Okay.  So after the monies were paid for the rehab,

5   what happened with the -- what happened with the property?

6       A.   They began construction.  At the beginning they were

7   moving pretty fast, and then they had an issue and they

8   basically took a couple of months before they did anymore

9   work.  And then they got started again with construction, and

10  then they put it on the market even though they hadn't quite

11  finished.  There was like a door that went -- basically you

12  could fall off of, you know, like a second story sliding door

13  you could fall over.  They had it on the market for a while.

14  They didn't get any offers, it was priced too high.

15      So we asked another real estate person that's very -- one

16  of the top real estate agents in the area, and he said that we

17  had it overpriced.  So we told them it was overpriced and they

18  still didn't lower the price.  And then about the time that

19  our note matured, they decided that they were going to finish

20  the property and get the final inspection from D.C.  And they

21  finally got the final inspection from D.C.

22      But basically there were three or four months where we

23  kept asking them what they were doing, and they basically

24  weren't even at the property.

25      Q.   Alright.  And after that -- after the note matured,

1    what did you attempt to do in order to -- did you do -- did

2    you make an attempt to take control of the situation?

3        A.   So before the note matured, we did contact Bob Moore

4    and asked him for the -- he never sent us the original of the

5    deed of trust.  And we asked him for the original so that we

6    could make sure that it was secured.  We also asked the title

7    company for it, because the title company was aware that we --

8    the title company knew that we had done it.

9        And they didn't have a copy of it, and Bob couldn't find

10   his copy as well, so we asked them to create a new note before

11   this note expired.  And the title company drafted a new note.

12   We tried to get Bob to sign it and he refused to sign it.

13       Q.   And then what did you want to do with the deed of

14   trust when you were asking for your deed of trust?  What did

15   you -- what steps did you want to take in order to sort of

16   stop the bleeding?

17       A.   So we wanted to file it and then we would have started

18   the foreclosure.

19       Q.   And there was a senior lien that was ahead of -- that

20   was also on this property, is that correct?

21       A.   That's correct.

22       Q.   And what was your motivation in order to do the

23   foreclosure?

24       A.   The motivation would be to stop the bleeding, to get

25   our money out of it.

1      Q.   And then just deal with the hard money -- the hard

2  money lender?

3      A.   Yeah, we talked to the hard money lender and they said

4  that we could have bought out their position and that we would

5  have had a stronger position to get the property sold.

6      Q.   And then was there a time that you discovered the

7  property was being foreclosed on?

8      A.   Only after we filed the lis pendens on it.

9      Q.   With the litigation for this case?

10      A.   Yes.

11      Q.   Alright.  And then the property did sell?

12      A.   It did sell.

13      Q.   Okay.  And from that sale, were there any proceeds

14  that you received from that sale?

15      A.   We did receive -- I don't remember the exact number,

16  less than $2,000.

17      Q.   And then during this whole time, have you been making

18  demands from Marck Properties to be reimbursed before you

19  filed suit?

20      A.   Yes.

21      Q.   And at this stage in time, have they paid anything

22  other than that small amount from the sale?

23      A.   Nothing other than that.

24      Q.   And the amount that they owe you -- giving them credit

25  for that sale -- as of now is $91,878.31, is that correct?

1          A.   Yes.

2               MR. COOGEN:  Your Honor, what I did was -- regarding

3     the terms of the note, I broke out just an interest worksheet

4     to give the Court just to see what my client is claiming.

5     With the principal and the interest it's $101,217.17, and then

6     that construction advance that was paid was the $15,000.  The

7     total due is $116,217.17.

8               THE COURT:  Alright.  Do you want to introduce this

9     into evidence?

10              MR. COOGEN:  Yes, your Honor.

11              THE COURT:  Alright.

12              MR. COOGEN:  Your Honor, I have no further questions

13    for this witness.

14              THE COURT:  So that would be Exhibit No. 7?

15              MR. COOGEN:  No, that would be No. 8, your Honor.

16              THE COURT:  8, 8, 8.

17              MR. COOGEN:  Your Honor, there's also the issue under

18    the note and deed of trust for the attorney's fees, but I

19    think that would be done under separate petition if I need to.

20    Your Honor, that's all I have for this witness.

21              THE COURT:  Now with respect to -- so the two

22    remaining counts, Mr. Coogen, is breach of contract, yes?

23              MR. COOGEN:  Yes, your Honor.

24              THE COURT:  And --

25              MR. COOGEN:  And the negligence count.

1        THE COURT:  So the negligence, what's the nature of

2    the negligence?

3        MR. COOGEN:  Your Honor, as my client testified to,

4    the delays in getting the repairs done, the mispricing of the

5    property which created this lag -- this incredible lag time.

6    This started closing in -- they closed on the property in

7    August.  It almost took them almost a year to even have a

8    showing.  And as my client testified to, the house wasn't even

9    fully completed when they did the showing.  Based on that --

10   and your Honor, Mr. Moore, this was his first transaction.  He

11   was new to real estate, this business.

12        THE COURT:  Mr. Moore was new or Mr. Topscher?

13        THE WITNESS:  Mr. Moore.

14        MR. COOGEN:  Mr. Moore.

15        THE COURT:  Mr. Moore was.

16        MR. COOGEN:  Mr. Moore, this was his first, and so it

17   was an absolute train wreck being -- because at one point in

18   time in the fall, you know, everyone was talking about how

19   lucrative it was.  But as you know, real estate changes, you

20   know, on the day of the week.  So what happened was his

21   inexperience caused my client to be left high and dry when he

22   found out that the deed of trust wasn't filed.  And that is

23   the -- that's where the negligence factor comes in.

24        THE COURT:  Mr. Topscher, did you have any business

25   with these folks before you entered into this agreement?

1              THE WITNESS:  No.

2              THE COURT:  As to whether or not they had any prior

3    experience?

4              THE WITNESS:  So Bob Moore didn't have any experience,

5    but William Jones --

6              THE COURT:  Bob Moore, who's Bob Moore?

7              THE WITNESS:  Bob Moore, he's Robert Moore.

8              THE COURT:  Robert Moore, yes, okay.

9              THE WITNESS:  But William Jones had flipped about 200

10   properties around here already.  So whatever --

11             THE COURT:  He had --

12             THE WITNESS:  He had --

13             THE COURT:  -- flipped?

14             THE WITNESS:  Yes.

15             THE COURT:  So he did have some exposure.

16             THE WITNESS:  So William Jones had done it, but Bob

17   Moore had not.

18             THE COURT:  Oh, I see.

19             MR. COOGEN:  William Jones, his -- from what I --

20             THE COURT:  A wealth of experience.

21             MR. COOGEN:  Yeah, he's good with the hands.  It's

22   just the other side of --

23             THE COURT:  Did they give you any reasons as to why of

24   this delay?

25             THE WITNESS:  The initial response was they needed

1    more money.  When I offered more money, they said they have --

2              THE COURT:  But they have a hard -- wasn't

3    this company a hard bank or something like that?  Did that --

4    what, they were loaning what, $400,000?

5              THE WITNESS:  Yes, sir, they loaned the purchase price

6    plus construction draws.

7              THE COURT:  And those costs went to Moore and Jones?

8              THE WITNESS:  To help purchase the property, yes.

9              THE COURT:  And they didn't give you any explanation

10   of why things were not holding up?

11             THE WITNESS:  There were lots of excuses, but nothing

12   really valid.

13             THE COURT:  Alright.  Thank you, Mr. Topscher.

14             THE WITNESS:  You're welcome.

15             THE COURT:  You may be seated.

16             THE WITNESS:  Thank you, your Honor.

17             MR. COOGEN:  I have nothing further, your Honor.

18             THE COURT:  So let's go back again, Mr. Coogen.

19   You're saying that you're going to be using Maryland or D.C.

20   law here?  Which one have you selected and why?

21             MR. COOGEN:  Your Honor, the property is located in

22   D.C.  It really is a choice of law.  We're just going to

23   stick -- we'll use the District of Columbia law is what we'll

24   use, because the property's located in D.C. and the

25   jurisdiction is near D.C.  In D.C. -- and it would be my

1    client's choice to figure out what he in essence is going to

2    use.  There's no contributory negligence on my client's part,

3    there's no allegation -- there's no response against my client

4    from the companies.  They've just chose to --

5         THE COURT:  How do you come up with the negligence

6    aspect here in terms of -- well, there was delay obviously.

7    But how do you quantify the negligence?

8         MR. COOGEN:  But, your Honor, the negligence is the

9    fact for the pricing.  And pricing is a key point for -- it's

10   not even the construction that is at issue -- I'm sure you can

11   go back in there -- but it is the pricing of the property, and

12   it was priced too high.  It was priced beyond where nobody

13   would -- nobody was even to look at it.  Once the price came

14   down, once they figured out a better price, then people

15   started coming in and then the property's going to move.

16        And I believe my client's understanding is that it was

17   due to the inexperience of Mr. Moore.  It was marketing the

18   property rather than -- once he talked -- once he got

19   professional advice as to where that property should be and

20   his constant droning in on them to get them to drop the price

21   lower and lower, that's where they had some traction on the

22   matter.  And then ultimately when hard money started to

23   foreclose, that got them to even really focus down and was

24   able to go ahead and sell it.

25        And the reason why it was selling, because several

1    months later if it was underwater nothing -- it would -- hard

2    money would have foreclosed and my client would have been

3    wiped out.  There would have been nothing to --

4            THE COURT:  No, I understand what you're saying, but

5    I'm still not sure how you quantify the negligence.  You're

6    saying guess what, things have changed and --

7            MR. COOGEN:  But here's another thing, your Honor, as

8    a joint venture and as a business partner -- which they were,

9    there's a duty to your business partners like I have a duty as

10   a partner in a law firm.

11           THE COURT:  Right, yes.

12           MR. COOGEN:  So you have a fiduciary duty in order to

13   do the best -- to get the best jobs done even though the

14   responsibilities and the acts are all separate.  Mr. Topscher

15   was the money man, Mr. Jones was the hands-on man and

16   Mr. Moore was supposed to be the marketing guy.  And that's --

17   you know, that's the way he sort of sold himself.

18           THE COURT:  Marketing in the sense of trying to sell

19   the house?

20           MR. COOGEN:  Exactly.

21           THE COURT:  Right.

22           MR. COOGEN:  And the infighting was that Moore -- I

23   mean, that -- if he's not selling it, he's not doing it

24   diligently or correctly or competently, then my client --

25   Mr. Jones suffers and Mr. Moore suffers -- I mean,

1    Mr. Topscher suffers.  So the relationship, the fiduciary

2    nature of the joint venture, it's akin to a partnership.

3         And I think that is where that duty and

4    responsibility -- and then for not responding as to letting

5    him know what's going on to knowing what the status of the

6    situation was or even confirming that his deed of trust wasn't

7    recorded, it wasn't until he filed this lawsuit that we were

8    finding out the true status of the nature of the matter.  And

9    it's that mismanagement that Mr. Jones sort of was penalized

10   and Mr. Topscher was penalized.  This is not like a couple of

11   grand, your Honor, this is $93,000 that his business took a

12   hit on and which he's still trying to recover from.

13        THE COURT:  I see.  So actually you're saying from the

14   negligence, that's the money that was lost of Mr. Topscher was

15   the $93,000, I see.  So there's not an additional amount of

16   money?

17        MR. COOGEN:  No, your Honor.

18        THE COURT:  Okay, yeah.

19        MR. COOGEN:  So under that count alone, just looking

20   at -- regarding the terms of the contract, it's just looking

21   at what his damages were as a result of the negligence.

22   Because the other thing is my client -- if the title -- if the

23   deed of trust was recorded and he was in a better position, he

24   could have taken an act, foreclosed and then worked with the

25   senior lienholder in order to maybe -- to take control of

1    this.  But because he didn't have that deed of trust recorded,

2    there's no lien against the property so he was at the mercy of

3    Moore even more to try to get the property sold.

4            THE COURT:  As you well know, I'm doing a report and

5    recommendation to the trial judge, Judge Jackson.  And I'm

6    still troubled here to the extent that, "This agreement shall

7    be construed and enforced in accordance with the internal laws

8    of the State of Maryland."  And so you have a contract

9    agreement which reflects Maryland law.

10           I also recognize that the house itself was in D.C. on

11   that.  So you say well, I'm happy to go and do it in D.C., but

12   I -- how do I explain that to the trial judge --

13           MR. COOGEN:  But your Honor --

14           THE COURT:  -- as to why you got something in a

15   contract that says Maryland law and you're saying well, you

16   know, we're okay with D.C. law?

17           MR. COOGEN:  But your Honor -- and even just to hear

18   what the contract pleaded, when I plead the complaint I used

19   the Maryland -- Maryland and D.C. are brother and sister

20   states.

21           THE COURT:  No, no, no, I mean, that's true.  I

22   understand they're neighbors.  The question is whether or not

23   it should be Maryland law or D.C. law.

24           MR. COOGEN:  But your Honor, the contract -- to

25   enforce the contract then Maryland law will be required,

1   because that was the agreement to be enforced.  So Maryland

2   law will govern the Court's --

3         THE COURT:  That's the law.  Obviously then Judge

4   Jackson will make a ruling as to the monetary aspect of it,

5   but she will look to Maryland law.

6         MR. COOGEN:  And I agree with the Court, because that

7   issue, how to handle that, that was the agreement that was

8   made with my client and them.  And I would concede that

9   Maryland law should govern the action.

10         THE COURT:  And I think under the circumstances and

11   the two counts, the remaining two counts, the impact of

12   Maryland law vis-a-vis the D.C. law I don't think has any

13   significance, real significance on that.

14         MR. COOGEN:  And the unjust enrichment, your Honor,

15   it's where if the contract failed for whatever reason.  And

16   that's just being -- and the conversion, your Honor, if I had

17   malice, if I had the real intent --

18         THE COURT:  No, no, I understand.

19         MR. COOGEN:  -- and I just -- and even though the guy

20   was a royal whatever, it's just not there to -- you know, if

21   there was evidence to -- as the clear and convincing evidence

22   standard, it's just not going to be enough.

23         THE COURT:  Alright.  Well, thank you, Mr. Coogen.

24       (Proceedings adjourned at 4:24 p.m.)

25

# C E R T I F I C A T E

       I, Jeff M. Hook, CSR, RPR, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Date: October 7, 2015       _____

                    Jeff M. Hook, CSR, RPR